Patricia S. HOFFMAN, Plaintiff,

v.

FIDELITY BROKERAGE SERVICES, INC., Defendant.

No. C–1–95–462.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 29, 1997.

Martin McHenry, Jacobs, Kleinman, Seibel & McNally, Cincinnati, OH, for Patricia S. Hoffman.

Gregory Parker Rogers, Taft, Stettinius & Hollister, Cincinnati, OH, for Fidelity Brokerage Services Inc.

## ORDER

HERMAN J. WEBER, District Judge.

This matter is before the Court upon Defendant Fidelity Brokerage Services, Inc.'s Motion for Summary Judgment (doc. 23), plaintiff Patricia Hoffman's opposing memorandum (doc. 27), and defendant's reply memorandum (doc. 28). Both parties have requested oral argument.

### The Requests for Oral Argument are Denied

The legal and factual issues involved in this case are not complex and they have been fully briefed by the parties. Pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Southern District of Ohio, the Court therefore finds that oral argument is not necessary and the parties' request for same is denied.

### Background

Plaintiff brings this action under the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101, et seq., and under Ohio Revised Code § 4112.02, which prohibits discrimination in employment on account of handicap. Plaintiff has also brought retaliation claims under the discrimination laws, but she does not oppose defendant's motion for summary judgment as to those claims.

### Findings of Fact

(1) Defendant Fidelity Brokerage Services, Inc. (Fidelity) is a mutual fund company which has a telephone customer service center in Blue Ash, Ohio.

(2) At the customer service center, Fidelity's Customer Service Representatives (CSRs) answer the telephones, complete mutual fund transactions such as purchases, exchanges, and redemptions, and provide information to customers concerning account

balance information, fund value quotes, and Fidelity product information. The CSRs use a multi-windowed, custom-designed computer system known as a retail work station to complete these tasks.

(3) Plaintiff Patricia Hoffman is legally blind. She is unable to read out of her left eye and has 20/400 vision in her right eye. Plaintiff is able to read out of her right eye only by wearing magnifying eyeglasses and holding the material she is reading a few inches from her glasses.

(4) Plaintiff is a graduate of Northern Kentucky University and has worked as a Service Representative with the Internal Revenue Service since 1991. In this capacity, plaintiff responds to customer inquiries over the telephone by accessing information from a computer and relaying it to the customer in a timely and accurate manner.

(5) In 1993, Fidelity decided to expand its Blue Ash operations from approximately 200 CSRs to 800 CSRs.

(6) In May of 1993, plaintiff contacted Fidelity about a position in its Customer Service Department. Plaintiff passed a screening interview conducted by telephone. On July 21, 1993, plaintiff submitted a formal employment application to Fidelity.

(7) Fidelity's hiring process for the CSR position consisted of screening and hiring applicants based on their educational credentials and oral communication skills. Fidelity did not require applicants to demonstrate proficiency in manipulating the retail work station before hiring. Fidelity trained newly-hired applicants to use the station. During the training process, individuals received information about applicable law and Fidelity products and gained familiarity with the work station, thereby improving their accuracy in manipulating the work station. Trainees were given the opportunity to manipulate the retail work station in a simulated setting. Fidelity did not test its new CSRs to determine whether they could use the work station proficiently before allowing them to service customers.

(8) On July 21, 1993, plaintiff was interviewed for the CSR position by Fidelity Manager Ken Rodenas. Plaintiff informed Rodenas that she was legally blind, that she would need modifications on the computer in order for her to do the CSR job, and that the Kentucky Department for the Blind (KDB) could assist with the modifications. Following the interview, Mr. Rodenas recommended that Fidelity hire plaintiff "as long as accommodations can be made." The following day, a member of Fidelity's personnel department telephoned plaintiff to discuss who at KDB Fidelity should contact regarding possible accommodations.

(9) Fidelity Human Resources Director Sallie Bottorff contacted May Kay Insko, a Certified Rehabilitation Counselor and the Regional Administrator of the KDB, regarding possible modifications to the CSR work environment. Insko informed Bottorff that plaintiff used a "VISTA" computer magnification device at her IRS job. VISTA is a piece of computer hardware which enables the user to enlarge text or graphics on a computer screen from three to sixteen times the original size. When one part of the screen is thus enlarged, other parts of the screen are obscured. Insko made a note on July 21, 1993, that plaintiff may only need a 20" monitor, but she did not communicate this information to Fidelity. Insko subsequently sought to follow up on her conversation with Fidelity representatives and called several times, leaving three to ten messages. Fidelity did not return Insko's calls.

(10) Fidelity also contacted SpecialLink, a non-profit group specializing in assistive technology for the disabled. Like the KDB, SpecialLink suggested use of VISTA. Bottorff and Dan Besse, Director of Customer Service Operations at Fidelity, enlisted the aid of Lori Vitali, a Fidelity retail work station specialist who had previously been a Fidelity CSR, to assist in finding an accommodation for plaintiff. Vitali began the process of determining whether VISTA could be adapted for use with the retail work station and Fidelity software.

(11) Although neither the KDB nor SpecialLink had suggested a larger screen as a possible accommodation, Fidelity representatives initially discussed the possibility among themselves but dismissed it based on the

assumption that this accommodation would not be sufficient.

(12) On August 12, 1993, plaintiff, Keith Creasy of KDB, and Barbara Chambers and Elaine Hackett of SpecialLink visited the Blue Ash facility for a demonstration by Creasy of the VISTA device. A security function on the computer would not allow VISTA to function with Fidelity's in-house software.

(13) Vitali kept the VISTA device to investigate the problem and to test it on a retail work station using Fidelity software. Vitali sent the VISTA device to Fidelity's facility in Dallas, Texas, where an employee corrected the security problem and returned the device to Vitali.

(14) On September 30, 1993, plaintiff visited the Blue Ash facility to assist Fidelity in identifying potential accommodations. During that visit, plaintiff sat with a CSR at a work station and observed and listened to the CSR handle customer calls. Plaintiff also viewed the screen of a computer on which VISTA had been installed. Vitali questioned plaintiff as to whether she could read the screen. Through her questioning, Vitali determined that plaintiff required a magnification of at least three times the original size of the characters on the screen before she could read a small portion of the computer screen from a distance of less than six inches. Following the meeting, Besse, Bottorff and Vitali discussed their concerns about whether plaintiff could be reasonably accommodated in light of the fact that she would be unable to view the entire screen at one time when using VISTA.

(15) Subsequently, plaintiff's application was placed with those of thirty-seven other applicants who were slotted for training in January, 1994, in the event Fidelity decided to hire any of them.

(16) In the fall of 1993, Fidelity began preparing to convert its retail work station from VGA to Super VGA, a graphics enhancement that permits the concurrent use of more and smaller multi-colored windows than VGA allows by making the characters on the screen smaller. Fidelity learned in late 1993 that VISTA did not support Super VGA. Fidelity began using the Super VGA in February, 1994.

(17) In December, 1993, Fidelity's Boston headquarters notified its Blue Ash facility that Fidelity did not need to hire any additional CSRs and that it was cancelling further hiring.

(18) Fidelity notified plaintiff by letter dated January 18, 1994, that it had rejected her application. The other thirty-seven applicants slotted for training in January received similar notices.

(19) Plaintiff filed a discrimination charge against Fidelity with the EEOC on March 20, 1994. Fidelity thereafter continued to seek methods for accommodating plaintiff. Vitali called the VISTA manufacturer and was informed that there was no Super VGA–compatible magnification product and that there were no plans to develop one. Vitali also contacted some government agencies for referrals to other assistive technology companies, but none offered suitable products. Bottorff contacted Visionware, a Boston company in the business of developing products for individuals with low vision, but the company could offer no product which might serve as an accommodation. Bottorff also contacted Elaine Hacket from SpecialLink, Mark Forsterling of the Cincinnati Association for the Blind, and Bruce Gollar of Ohio Rehabilitation Services, but those contacts were not productive.

(20) In late May of 1994, Fidelity again contacted KDB. Subsequently, Vitali and other Fidelity representatives met with Brenda Kramer and Wayne Thompson of KDB on June 13, 1994, to test three different types of technology, including VISTA. None of the three technologies worked on Fidelity's software. Kramer concluded that the only other possible accommodation for plaintiff was a larger monitor.

(21) Defendant arranged for plaintiff to come to its Blue Ash facility on August 1, 1994, to explore the feasibility of using a 21" monitor. Plaintiff canceled that meeting because she was ill. The meeting was rescheduled and plaintiff and Kramer came to the Blue Ash facility on September 19, 1994. The meeting lasted approximately one hour.

Kramer observed a CSR perform the job for 15 to 20 minutes before observing plaintiff. Plaintiff was not given an opportunity to familiarize herself with the retail work station before being observed on it. Bottorff, Vitali, Besse, and Fidelity's attorney observed plaintiff as she sat at a work station with a 21" monitor and was asked to scroll through typical screens on the Fidelity software. Vitali asked plaintiff to read information on the screen, to locate and click on particular areas, and to enter account information. When asked to read information after she had located it, plaintiff made errors in identifying both words and numbers and in entering data. According to Besse and Vitali, plaintiff had an error rate of 25% to 50%. According to Kramer, plaintiff made a "few" errors.

(22) After the demonstration, Vitali, Besse and Bottorff discussed plaintiff's performance among themselves and each opined that plaintiff was unable to perform the essential functions of the CSR position because she was too slow and too inaccurate.

(23) On October 12, 1994, Kramer returned to Fidelity to review plaintiff's performance during the demonstration. Besse and Bottorff expressed to Kramer their concerns about plaintiff's abilities using the 21" inch monitor on the retail work station. Kramer opined that given a chance, plaintiff could do the job. Kramer suggested no other accommodations to Fidelity.

(24) In December, 1994, plaintiff returned to Fidelity and was there for approximately two hours. Jack Patrick, an investigator with the EEOC who had been assigned to investigate plaintiff's charges, observed plaintiff as she sat at a "dummy screen", watched a CSR at work, and listened to the CSR's conversations on headphones.

(25) Fidelity opened a facility in Covington, Kentucky in 1994. In February of 1995, Ginger Timberlake, a Fidelity employee, contacted plaintiff and asked if she was interested in interviewing for a job at that facility. Timberlake and plaintiff met to discuss job possibilities on February 16, 1995. The two also spoke by telephone on April 3, 1995 and May 8, 1995, regarding available positions and necessary accommodations.

(26) Plaintiff filed this lawsuit on June 19, 1995. On August 23, 1995, plaintiff met with Timberlake and other Fidelity representatives to discuss a job opening in the mutual fund new account area. Paul Smith, the Site General Manager in Covington, suggested to plaintiff that if she could get a leave of absence from the IRS, she could try this job on a trial basis to see if she liked it. Plaintiff rejected any further exploration of this position.

(27) In the fall of 1995, Fidelity learned that an enhancement package for Super VGA called Super VISTA had been invented. Super VISTA does not support Windows NT, the operating system used at Fidelity's Blue Ash facility. Fidelity determined that Super VISTA, however, would support the Windows 3.1 operating system in Covington and that plaintiff might be able to perform as a customer contact representative in that division. A customer contact representative initiates contact with customers to set up new accounts or to resolve problems with new accounts but does not execute mutual fund purchases or other transactions.

(28) Plaintiff met with Fidelity personnel on October 9, 1995, to discuss the customer contact position. In November, 1995, Fidelity offered plaintiff the customer contact position in Covington. Plaintiff declined the offer because she did not feel that the position was as stimulating as a CSR position.

## Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). All reasonable inferences must be drawn in favor of the non-moving party in determining if a genuine issue of material fact exists. *Kunz v. United Food & Commercial Workers, Local 876,* 5 F.3d 1006, 1008–09 (6th Cir.1993). The Court must ascertain whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The mere possibility of a factual dispute is insufficient to preclude summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (*quoting Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)).

### Applicable Law

The ADA, 42 U.S.C. § 12112(a), provides, in pertinent part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring ... of employees, ... job training, and other terms, conditions, and privileges of employment."

"Discriminate" as defined under 42 U.S.C. § 12112(b)(5)(A) includes,

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

"Discriminate" also means limiting or classifying a job applicant or employee in a way that adversely affects his or her status because of a disability; utilizing standards or criteria that have the effect of discrimination on the basis of disability; and denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability if such denial is based on the employer's need to provide a reasonable accommodation.

In order to prevail on an ADA claim, the claimant must prove that "(1) she has a disability; (2) she was qualified for the job; and (3) she either was denied a reasonable accommodation for her disability or was subject to an adverse employment decision that was made solely because of her disability." *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir.1996). Plaintiff has the initial burden of proposing an accommodation and showing that it is objectively reasonable. *Monette v.*

*Electronic Data Systems Corp.*, 90 F.3d 1173, 1183 (6th Cir.1996). If she satisfies her burden, the burden of persuasion is on defendant to show that an accommodation would pose an undue hardship. *Id.* Alternatively, if the employer claims that the plaintiff would be unqualified to perform the essential functions of the job. even with the proposed accommodation, the plaintiff must prove that she would in fact be qualified for the position if the employer were to adopt the proposed accommodation. *Id.* at 1183–84.

Ohio Revised Code § 4112.02 makes it an unlawful discriminatory practice:

> (A) For any employer, because of the ... handicap ... of any person, to ... discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

■ To establish a prima facie case of handicap discrimination under Ohio law, the claimant must establish that "1) she is handicapped; 2) action was taken by her employer, at least in part because she is handicapped; and 3) she can safely and substantially perform the essential functions of the job in question with reasonable accommodations." *Blankenship v. Martin Marietta Energy Systems*, 83 F.3d 153, 155 (6th Cir.1996) (*citing Hazlett v. Martin Chevrolet, Inc.*, 25 Ohio St.3d 279, 496 N.E.2d 478 (1986); *Wooten v. City of Columbus*, 91 Ohio App.3d 326, 632 N.E.2d 605, 608–09 (1993)). Once the claimant establishes a prima facie case, the burden of production shifts to the defendant to show that the challenged criteria are job-related and are required by business necessity, and that no reasonable accommodation is possible. *Id.* If plaintiff fails to establish a prima facie case, the question of reasonable accommodation does not arise. *Id.*[1]

A qualified individual with a disability means "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of

---

1. The essential elements of a claim under the ADA and the Ohio handicap discrimination statute are the same. Therefore, the caselaw regarding claims brought under the ADA applies equally to claims brought under the Ohio statute. *Richardson v. William Powell Co.*, 3 A.D. Cases 1751, 1994 WL 760695 (S.D.Ohio 1994)(Weber, J.).

the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

The federal regulations define "essential functions" as the fundamental job duties of the employment position the individual with a disability holds or desires. 29 C.F.R. § 1630.2(n)(1). Whether a particular function is essential is a factual determination which must be made on a case-by-case basis. 29 C.F.R. Pt. 1630, Appendix to 1630.2(n). A job function may be considered essential for many reasons, including the reason that the position exists for performance of that function. 29 C.F.R. § 1630.2(n)(2)(i). Evidence of whether a particular function is essential includes, but is not limited to, the employer's judgment as to which functions are essential, written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time spent on the job performing the function, and the consequences of not requiring an employee to perform the function. 29 C.F.R. § 1630.2(n)(3). The inquiry into what are the essential functions of a job "is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards." 29 C.F.R. Pt. 1630, Appendix to 1630.2(n).

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustments or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Reassignment to a vacant position should be considered only when accommodation within the individual's current position would pose an undue hardship. 29 C.F.R. Pt. 1630, Appendix to 1630.2(o). Reassignment is not available to applicants, who must be qualified for, and be able to perform the essential functions of, the position sought, with or without reasonable accommodation. *Id.* An employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified, with or without accommodation. *Id.*

■ An employee cannot insist that her employer provide a specific accommodation if another reasonable accommodation is instead provided. *Hankins v. The Gap,* 84 F.3d 797, 800–01 (6th Cir.1996). If the employee "rejects a reasonable accommodation ... that is necessary to enable the individual to perform the essential functions of the position ... the individual will not be considered a qualified individual with a disability." *Id.* at 801 (*citing* 29 C.F.R. § 1630.9(d)).

The federal regulations specifically authorize an employer to make certain pre-employment inquiries with regard to a disabled applicant. 29 C.F.R. § 1630.14(a) provides as follows:

A covered entity may make pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions.

The employer may make such requests of an applicant whose known disability may interfere with or prevent the performance of a job-related function, whether or not the employer routinely makes such a request of all applicants in the job category. 29 C.F.R. Pt. 1630, Appendix to 1630.14(a). If the employer requires an applicant with a disability to demonstrate how she will perform a job-related function, the employer must either provide the reasonable accommodation the applicant needs to perform the function or permit the applicant to explain how she will perform the function with the accommodation. *Id.* If the job-related function is not

essential, the employer may not exclude the applicant because of her inability to perform that function. Rather, the employer must, as a reasonable accommodation, either provide an accommodation that will enable the applicant to perform the function, transfer the function to another position, or exchange the function for one the applicant is able to perform. *Id.*

The federal regulations state that in order to determine the appropriate reasonable accommodation, it may be necessary for the employer "to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

### The parties' positions

Defendant contends that it is entitled to summary judgment because, as a matter of law, plaintiff is not a qualified individual with a disability since she could not perform the essential functions of the CSR position with or without reasonable accommodation.[2] Defendant alleges that accuracy and efficiency are essential functions of the CSR position and that plaintiff failed to demonstrate that she could perform the CSR job with the requisite speed and accuracy. Defendant also contends that its pre-employment inquiries into plaintiff's ability to perform the CSR position are expressly sanctioned by the ADA. Finally, defendant alleges that plaintiff's discrimination claims are meritless because she refused its offer of an alternative position, which was a reasonable accommodation.

Plaintiff counters that defendant cannot establish that she is not a "qualified individual with a disability" since defendant does not dispute that upon hire, plaintiff could have performed the only function performed by any other newly-hired CSR; i.e., present herself for training. Plaintiff alleges that defendant discriminated against her in job application procedures by imposing upon her the additional requirement of demonstrating that after training, she would be able to perform the CSR job with speed and accuracy. Plaintiff further alleges that defendant discriminated against her by refusing to hire her based on its concern about issues raised by her disability. Plaintiff also asserts that defendant discriminated against her in job training by providing training to other newly-hired CSRs but denying it to plaintiff because her disability reduced their "comfort level". Plaintiff also contends that she was discriminated against in opportunities because defendant placed her job application on hold and denied her pay, education, and training provided to other applicants.

In addition, plaintiff contends that defendant has failed to establish that those functions which it has identified as essential components of the CSR position are in fact essential. Plaintiff also alleges that defendant's opinion that she was unable to satisfactorily perform the CSR job is controverted by the testimony and opinion of other witnesses. Finally, plaintiff alleges that Fidelity cannot escape liability under the ADA by offering plaintiff a position at its Covington facility for which she did not apply.

### Analysis

Defendant concedes that plaintiff is disabled as defined under 42 U.S.C. § 12102(2)(A) and Ohio law.

■ Initially, the Court finds that defendant did not violate the ADA by making pre-hiring inquiries into whether plaintiff's known disability would prevent her from performing the CSR job. Defendant's actions are expressly sanctioned under the federal regulations. *See* 29 C.F.R. § 1630.14(a). It is reasonable that defendant would ask plaintiff to demonstrate that she could perform the CSR job before hiring her since the job required the ability to read characters on a computer screen and enter information, and plaintiff's representations to defendant regarding her vision impairment and her need for accommodations raised a question as to whether her impairment precluded her from

---

**2.** Defendant has submitted a videotape which purportedly shows a demonstration of typical CSR job duties. The Court finds that it is unnec-essary to view the videotape in order the resolve the summary judgment motion and has therefore neither viewed nor considered the videotape.

performing these functions. Plaintiff's claim that defendant's pre-employment inquiries into her ability to perform the CSR job with these accommodations were discriminatory since defendant did not make similar inquiries before hiring applicants without disabilities is baseless.

■ The Court also finds that defendant satisfied any obligation it may have had to initiate an informal, interactive process for identifying both the precise limitations resulting from plaintiff's disability and the reasonable accommodations that could overcome those limitations. *See* 29 C.F.R. § 1630.2(*o*)(3). The undisputed facts disclose that defendant initiated several contacts and worked with plaintiff in an effort to find an accommodation for her.

■ Plaintiff, in turn, satisfied her obligation to propose reasonable accommodations, which were VISTA and a larger monitor. Defendant claims, however, that plaintiff was unable to perform the essential functions of the CSR position with the proposed accommodations. Defendant has identified the essential functions of the CSR job as speed and accuracy in performing transactions and relaying information. Plaintiff contends that defendant has failed to establish that these are essential functions of the CSR job because Fidelity has no objective standards by which to determine a satisfactory level of speed and accuracy.

Defendant acknowledges that it has no quantitative standards which it employs to assess whether a CSR is performing his or her job with sufficient speed and accuracy.[3] It is not necessary, however, that an employer's performance standards be quantifiable. Rather, an employer is permitted to exercise its business judgment in establishing performance standards and in determining whether an individual can meet its standards, "whether qualitative or quantitative" 29 C.F.R. Pt. 1630, Appendix to 1630.2(n).

Defendant has come forward with sufficient, credible evidence to establish that speed and accuracy are essential functions of the CSR job. Besse testified at his deposition, and plaintiff does not dispute, that a CSR must satisfy customer expectations of proficiency in responding to their requests (Besse depo., p. 52), and that an error in providing information to a customer could subject Fidelity to liability for any monetary loss incurred by the customer as a result of the error (*Id.*, p. 56). Defendant has also established that it has qualitative means for determining whether a CSR's level of speed and accuracy meets Fidelity's performance expectations. Besse testified that Fidelity gages accuracy and customer satisfaction by surveying customers about their interactions with CSRs and by having personnel in its Internal Quality Department and managers work with CSRs and listen to their telephone calls in order to gage accuracy (*Id.*, pp. 53–55).

Plaintiff has not come forward with any evidence which raises a genuine issue as to whether speed and accuracy are essential functions of the CSR job and whether defendant employs appropriate means to qualitatively assess a CSR's level of performance in these areas. Accordingly, in order to proceed to trial on her discrimination claims, plaintiff must come forward with sufficient evidence to raise a genuine issue of fact as to whether she would be qualified to perform these essential functions of the CSR position with the proposed accommodations.

Plaintiff has not carried her burden to show that there is a genuine issue of fact as

---

**3.** Fidelity has come forward with some statistics regarding the accuracy of its CSRs which are indicative of the level of performance it expects. *See* Affidavit of Alicia Cowell, Director of Quality for defendant (attachment to defendant's motion for summary judgment). According to the statistics for the mutual fund group at the Blue Ash facility, the average accuracy rates for CSRs for all aspects of the job was 93.5% in 1994; 95.5% in 1995; and 94.2% from January 1996 to October 31, 1996. The data input accuracy rate was 98.2% in 1994; 98.3% in 1995; and 97.5% in 1996 (through October) Fidelity has no statistics for speed and plaintiff has not suggested any quantitative measures which defendant could have applied to gage a CSR's speed in performing the job. It is difficult to conceive of any such quantitive standards given the nature of the CSR job, i.e., responding to customer inquiries and performing transactions at the customer's request.

to whether she could have performed the CSR job with either VISTA or a larger screen. Fidelity has articulated legitimate concerns as to whether VISTA was a reasonable accommodation since VISTA obscures part of the computer screen and precludes the user from seeing at one time all of the information necessary to complete the job. Assuming plaintiff could have performed the CSR job with the VISTA accommodation, it is undisputed that VISTA was not an available option as of February, 1994, when Fidelity converted its retail work station from VGA to Super VGA. Defendant cannot be held liable for failing to provide an accommodation which was to become obsolete shortly after plaintiff could complete training.

Defendant gave plaintiff an opportunity to demonstrate that she could perform the CSR job with sufficient speed and accuracy using the second proposed accommodation, a 21" monitor. Fidelity's managers observed plaintiff perform in a retail work station with this accommodation. While the managers did not count the number of errors plaintiff committed when reading characters on the computer screen, they estimated that plaintiff had an error rate ranging from 25% to 50%. Based on their observations of plaintiff in the retail work station and their knowledge of the CSR position and its requirements, Fidelity's managers determined that plaintiff lacked sufficient speed and accuracy to perform the CSR job. It is not the role of the Court or the trier-of-fact to second-guess Fidelity's business judgment that plaintiff's error rate was too high and that her performance was too slow to be able to perform the CSR job up to Fidelity's standards. Rather, Fidelity's business judgment is entitled to deference unless plaintiff has come forward with evidence which raises an issue as to whether defendant's determination was made in bad faith or was a pretext for discrimination.

In order to rebut defendant's conclusion that plaintiff lacked sufficient speed and accuracy to perform the CSR job, plaintiff offers the deposition testimony of Brenda Kramer, Jack Patrick, and William Cody, who presents himself as a vocational expert, together with Cody's vocational report.

Brenda Kramer observed plaintiff perform a demonstration at the retail work station with the 21" monitor. Kramer testified at her deposition as follows: Plaintiff was slow in finding the pointer on the computer screen, but Kramer believes she eventually found it. When plaintiff could not find the pointer, Fidelity employee Vitali would physically point plaintiff to different parts of the screen so that she could locate them. Plaintiff was slow in finding various items that she was asked to locate on the screen. Plaintiff made a few errors in reading numbers and words, but Kramer cannot say how many times she misread information. When Kramer met with Fidelity representatives at a later date, the representatives questioned plaintiff's ability to do the job because she had made a few errors, they were concerned with her speed and accuracy, and they were concerned about the many screens that were in the system. Kramer opined that if plaintiff were familiar with the system and had a small amount of training, she could eventually do the job. (Kramer depo., pp. 46–51).

Jack Patrick observed plaintiff at a retail work station with a 21" monitor during the course of the EEOC's investigation of plaintiff's discrimination charge. Patrick mistakenly believed that plaintiff was operating the computer and manipulating the cursor as he observed her, but in fact she was following along on a "dummy" screen while a CSR operated another computer. Patrick testified that he asked plaintiff to read the part of the screen that she was viewing and that she could do so accurately. (Patrick depo., pp. 13–15). Fidelity's Senior Human Resource Representative Sherry Rowe, who was present at the demonstration, testified that Patrick only asked plaintiff whether she could follow along with the CSR, to which she replied affirmatively. (Rowe depo., p. 81). Plaintiff acknowledges that she was not manipulating the computer that day and she does not recall whether Patrick or any Fidelity employee asked her at the demonstration if she could do the job. (Pltf.depo., pp. 123–25).

Cody has submitted a report which is signed by him but which was prepared by plaintiff's counsel based on information which

Cody provided. Cody states in his report that he is a recognized expert in the fields of vocational evaluation and rehabilitation. Cody opines that plaintiff is a qualified individual with a disability with respect to the CSR position at Fidelity. Cody states that his opinion is based on the following conclusions: (1) plaintiff met the selection criteria, i.e., the oral communication skills and education accomplishments, which Fidelity utilized for hiring CSRs; (2) had she been hired, plaintiff would have been just as likely as any other CSR applicant hired by Fidelity to perform to its expectations after training, provided she was afforded a reasonable accommodation; (3) a reasonable accommodation would have been VISTA in 1993 and a 21" monitor thereafter since it is undisputed that plaintiff was able to see and recognize the screen on Fidelity's retail work stations when each of these accommodations was implemented; (4) the suggestion by Vitali and Besse that plaintiff was unable to read accurately or quickly enough does not change his opinion, and the suggestion is inconsistent with principles of vocational evaluation since it was made before plaintiff, who had demonstrated the ability to see and recognize characters on the computer screen, had received the training and experience provided to other applicants; (5) despite the suggestion of Vitali and Besse that plaintiff would have been unable to perform the essential functions of the CSR position after training, they recognize that training and experience are invaluable to CSRs in developing their skills and abilities for the CSR position; (6) he is concerned with Fidelity's suggestion that plaintiff would have been unable to perform to its expectations for speed and accuracy since such expectations are highly subjective and are not quantifiable; and (7) Fidelity's suggestion that plaintiff would have been unable to perform to its expectations after training is inconsistent with her work history, specifically the fact that she has worked as a customer service representative at the IRS in a fast-paced setting and that she has performed well in that position. Cody states that his opinion that plaintiff could perform the CSR job is based largely upon the assessment of Kramer, who is qualified by training and experience to assess the voca-

tional potential of individuals with visual impairments.

The testimony and opinions of Kramer, Patrick and Cody are insufficient to rebut the judgment of Fidelity's managers that plaintiff was unable to read the characters on a 21" monitor with sufficient speed and accuracy to perform the essential functions of the CSR job. Each of these three individuals has conceded that he or she has no knowledge of the speed and accuracy with which the CSR job must be performed. Kramer has acknowledged that she does not know what expectations Fidelity has for its CSRs in terms of accuracy, the expectations of Fidelity's customers as to speed of service, and the ramifications if the CSR makes mistakes with numbers in the transaction process. (Kramer depo., pp. 51–52). In fact, Kramer stated that she has no idea what the expectations are for performance of the CSR position. (Kramer depo., p. 58). Patrick testified at his deposition that he is not in any position to judge how well plaintiff performed on the day he observed her at Fidelity, he has no knowledge of what job performance expectations Fidelity has for its CSRs, he does not know what the essential functions of the CSR position are, and he cannot say whether plaintiff could perform the essential functions of the job. (Patrick depo., pp. 19–22).

Although Cody has offered an opinion that plaintiff could perform the CSR job, his opinion lacks a sufficient foundation. Cody admits that he has never been to Fidelity to observe the CSR job and he has never seen plaintiff using a 21" monitor, he does not know how much of the computer screen plaintiff would have to be able to view at one time in order to perform the CSR job, he does not know what percentage of the characters plaintiff needs to be able to accurately see in order to perform the essential functions of the job, he does not know what level of accuracy in data entries is expected of a CSR, and he does not know what level of speed is required of a CSR in responding to customer inquiries. (Cody depo., pp. 12, 36, 38–40, 52). Cody admitted that he does not know whether plaintiff would be able to perform the CSR job if she could accurately

recognize only 50% to 75% of the characters on the screen. (*Id.*, pp. 38–40). In addition, Cody has no idea what percentage of the characters on the screen plaintiff was able to recognize when a 21" monitor was utilized. (*Id.*, p. 37). Although Cody opined that training would enable plaintiff to locate information on the computer screen more quickly, he could not say that training would enable plaintiff to recognize the characters on the screen more accurately. (*Id.*, pp. 40–41). In view of his lack of knowledge of plaintiff's abilities and the requirements of the CSR position, Cody's report lacks a sufficient basis to support a finding that plaintiff could perform the CSR job with the accommodation of a 21" monitor.

Plaintiff believes that Fidelity tried every accommodation suggested to it (pltf. depo., pp. 160–61), and there is no evidence that Fidelity could have provided to plaintiff any accommodations other than those attempted. In fact, Fidelity offered an accommodation in addition to those suggested to it and which it was not obligated to provide, which was a job in a different position. Because plaintiff has failed to come forward with sufficient evidence to permit a reasonable juror to conclude that she could perform the CSR job with reasonable accommodation, and because she refused the offer of an alternative position, she cannot establish that she is a qualified individual with a disability.

### Conclusion

This case presents a situation where the employer has certain qualitative expectations of its employees and has articulated legitimate reasons for its determination that plaintiff cannot meet those standards. The only evidence offered to rebut the employer's determination is testimony of individuals who admittedly have no knowledge of the essential functions of the CSR job and of whether plaintiff could have satisfactorily performed those functions. Such evidence is insufficient to raise a genuine issue as to whether Fidelity's business judgment that plaintiff could not do the CSR job with the proposed accommodations was pretextual or made in bad faith. Defendant is therefore entitled to judgment as a matter of law.

Summary judgment is hereby **GRANTED** in favor of Defendants. This case is **DISMISSED** at plaintiff's costs and terminated on the docket of this Court.

**IT IS SO ORDERED.**