**Keith A. McQUAIN, Plaintiff,**

v.

**EBNER FURNACES, INC., Defendant.**

**No. 1:98 CV 1386.**

United States District Court,
N.D. Ohio,
Eastern Division.

June 17, 1999.

Thomas S. Kot, Armbruster & Kelley, Akron, OH, Katherine Hart Smith, Akron, OH, for plaintiff.

David T. Andrews, Evelyn P. Schonberg, Ross, Brittain & Schonberg, Cleveland, OH, for defendant.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment. For the reasons stated below, Defendant's Motion for Summary Judgment (Document # 17) is GRANTED. Plaintiff's federal law claims, and OHIO REV. CODE § 4112 claim, are DISMISSED. Plaintiff's state law claim under OHIO REV. CODE § 4123.90 is REMANDED to the state court for further proceedings.

### Factual and Procedural History[1]

Plaintiff, Keith McQuain, filed this civil action against Defendant, Ebner Furnaces, alleging that Defendant violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.;* the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.;* OHIO REV.CODE §§ 4112.02(A), 4112.99 (disability discrimination); and OHIO REV.CODE § 4123.90 (workers' compensation retaliation).

Plaintiff began working for Defendant on July 2, 1989, as a receiving clerk in the shipping and receiving department. (McQuain Dep. at 34.) Plaintiff checked incoming shipments and stored the contents on shelves. (McQuain Dep. at 34–35.) He was put in charge of receiving in 1991. (McQuain Dep. at 37.) In this capacity, Plaintiff unloaded delivery trucks, opened the boxes and unloaded the contents, checked the orders for accuracy and damage, stored the contents on shelves, recorded the location of the contents, delivered parts within the company, and occasionally made interstate deliveries. (McQuain Dep. at 37–38.) Plaintiff was required to lift items of up to 150 pounds, on average, two or three times per day and items over 50 pounds fifty or sixty times per day. (McQuain Dep. at 40.)

Plaintiff suffered an accident while unloading a delivery when nine bottles of welding fuel fell on Plaintiff from the lift gate of a delivery truck on August 3, 1993. (McQuain Dep. at 50–53.) Plaintiff returned to work within one week. (McQuain Dep. at 55.) Plaintiff's doctors discovered, in October 1993, that as a result of the accident Plaintiff had two crushed vertebrae and four ruptured disks. (McQuain Dep. at 57.) In November 1993, Plaintiff's doctors notified Defendant that Plaintiff could not perform any heavy lifting at his job. (McQuain Dep. at 59.) Plaintiff's physician placed him under restrictions of no bending, stooping, reaching, pushing, pulling, or lifting anything over twenty pounds. (McQuain Dep. at 62.) However, his pain worsened and on January 26, 1994, Plaintiff took his first

1. The factual history is based upon the parties' pleadings, filings, and statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to Plaintiff, the nonmoving party.

extended leave of absence in order to undergo surgery, which resulted in Plaintiff being placed in a body cast. (McQuain Dep. at 57–69.)

Plaintiff was well enough to return to work on August 29, 1994, in a part-time capacity; he worked four hours per day as a quality control inspector. (McQuain Dep. at 83, 88.) Defendant had filled Plaintiff's former position in the receiving department. (McQuain Dep. at 81.) Plaintiff, however, admitted that he could no longer do certain aspects of that job, such as the physical lifting and carrying over 50 pounds. (McQuain Dep. at 81.) Defendant offered Plaintiff a new part-time position in the quality control department, which Plaintiff accepted. (McQuain Dep. at 82–83.) The duties of this new position included clerical work, physically checking parts and purchase orders, filing of requisitions and certifications, and inspecting and testing the incoming steel. (McQuain Dep. at 83–87.) The lifting involved in this position did not exceed 30 pounds. (McQuain Dep. at 83.) After six weeks on this new job, in October 1994, Plaintiff experienced further problems with his leg and back. (McQuain Dep. at 91–93.) Plaintiff's doctor recommended that Plaintiff should not continue working; as a result, Plaintiff took his second leave of absence. (McQuain Dep. at 92–93.)

The second leave lasted for seven months; from October 1994 to circa May 1995. (McQuain Dep. at 93.)[2]

In January 1995 (while Plaintiff was still out on leave), Defendant, in consultation with the Bureau of Workers' Compensation, created another position for Plaintiff called an installation clerk. (Weigand Dep.Ex. 5.) Defendant described the position to Plaintiff's doctors in a letter dated March 16, 1995. (Weigand Dep.Ex. 6, 7.) Plaintiff did not immediately take the job because he was recovering from surgery. (McQuain Dep. at 135.)

As noted above, seven months after taking a leave of absence from the quality inspector position (circa May 1995), Plaintiff returned to work. (McQuain Dep. at 93.) He performed clerical work in three departments: quality control, production, and installation. (McQuain Dep. at 93–95.) Plaintiff's duties included filing, answering the phone, and computer input. (McQuain Dep. at 95.) Plaintiff started working four hours per day, three days per week, progressing to six hours per day, five days per week. (McQuain Dep. at 96.) Thereafter, Plaintiff experienced further problems with his leg muscles, back, and other work-related stress. (McQuain Dep. at 98–100.) The work-related stress was due to the claimed behavior of fellow workers, who allegedly had been instructed not to talk to

**2.** There is some confusion in the record regarding the number of times Plaintiff returned to work and went out on extended medical leave (not including the week off after his injury); particularly regarding the second return to work. In his deposition, Plaintiff outlines four leaves of absence and notes that his second medical leave lasted seven months after his first return to work; thus, he returned to work for the second time seven months after his second leave. Defendant states in its motion for summary judgment that "Plaintiff's second leave of absence lasted for nearly two years . . . ." Defendant's cite to the record (McQuain Dep. at 136) is indecisive because the question asked in the deposition does not rule out Plaintiff's time line of going back to work once in 1994, once in 1995, and once in 1996 (with two medical leaves in 1994, one in 1995, and one in 1996). Plaintiff recites four leaves of absence in his

response to Defendant's motion. Defendant did not contest this characterization in its reply to Plaintiff's response. It seems that Defendant's counsel tried to clear up the situation at the deposition, but Plaintiff's response reinforces the four-leave scenario. *See* McQuain Dep. at 140–41 (Q: The date on the check is 8–23–96. Does that give you a better idea as to when you took the installation job? \*\*\* A: Could have been before that, too. . . . Because I took the job before that. . . .). There is evidence in the record to support a four-leave scenario. Defendant has not convincingly provided facts for its three-leave scenario. Therefore, taking the facts in the light most favorable to the nonmoving party, the Court determines, for purposes of this motion, that Plaintiff left on medical leave four times and returned to work from medical leaves three times.

Plaintiff, but rather to isolate him and humiliate him so that he would quit. (McQuain Dep. at 101–13.) Pursuant to his doctor's recommendation, Plaintiff took a third leave of absence. (McQuain Dep. at 100.) The third leave of absence lasted until July 1996. (McQuain Dep. at 141.)

Plaintiff again returned to work in July of 1996 in the position of installation clerk. (McQuain Dep. at 141; Weigand Dep. at 64; Weigand Dep.Ex. 10.) In this position, Plaintiff had walking and carrying limitations. (Weigand Dep.Ex. 10.) Within four months, on November 8, 1996, Plaintiff went on his fourth leave. (Weigand Dep.Ex. 8.) This was the third position that Plaintiff had since his injury: he left the part-time quality control position because of pain to his leg and back; he could not perform the clerical work position even on a part-time basis; and, he could not sustain the work in the position of installation clerk—a job created especially for him by Defendant and the Bureau of Workers' Compensation. In 1997, Defendant continued to pay Plaintiff wage continuation in lieu of paying workers' compensation because Defendant believed that it was more cost effective for it to do so. (Weigand Dep. 69–70; Weigand Dep. Ex. 10.)

In early 1997, Plaintiff allegedly told several of Defendant's management personnel·that he wanted to return to work. (McQuain Dep. at 147–48.) In June 1997, Plaintiff allegedly provided Defendant with a doctor's note allowing Plaintiff to return to work with certain restrictions. (McQuain Dep. at 148.) Defendant informed Plaintiff on September 5, 1997, that as of September 1, 1997, it would count his medical leave as "qualified medical leave under the provisions of the Family and Medical Leave Act." (McQuain Dep. at 145–46; McQuain Dep.Ex. 8, 9.)

By October 7, 1997, Plaintiff notified Mark Weigand, Human Resources Manager, that he could return to work forty hours per week with an accommodation of light duty or sedentary work. (Weigand Dep.Ex. 10; McQuain Dep. ·at 149; Weigand Dep. at 90–92.) Defendant stated that there were no positions open at that time. (Weigand Dep. at 94.) Plaintiff claims that he handed a medical report to Mr. Weigand in the first week of October (McQuain Dep. at 149). Defendant, however, contends that Plaintiff handed Mr. Weigand the report on October 28, 1997—the date which is time-stamped on Defendant's copy of the report. (Weigand Dep. Ex. 10, 18.) The medical report, dated October 6, 1997, stated that Plaintiff's restrictions were permanent. According to the report, Plaintiff could sit for four hours per day; stand for three hours per day; could occasionally bend, squat, crawl, climb, and reach; could never lift over 50 pounds, but could lift 11–50 pounds occasionally and 5–10 pound frequently; could never carry over 26 pounds, but could carry 5–25 pounds occasionally; could not use his hands in repetitive action in pulling and pushing arm controls; and, could not use his feet in repetitive movements of leg controls. (Weigand Dep.Ex. 18.) At this time, Defendant considered Plaintiff to be out on leave under FMLA. (Weigand Dep. at 92–93.)

Defendant examined "very closely and viewed heavily" Plaintiff's medical report. Mr. Weigand testified that "the main thing was, did we have a job open that met the limitations and, you know, that was really the driving factor." (Weigand Dep. at 100.) On November 4, 1997, Plaintiff called Jim O'Brien, the Vice President of Operations, regarding his return-to-work status with Defendant. (Weigand Dep. at 98.) After reviewing the medical release from Plaintiff's doctor and considering Plaintiff's physical limitations, Defendant determined that Plaintiff would not be able to return to his position in shipping and receiving, and there were no other positions available for a person with Plaintiff's qualifications. (Weigand Dep. at 109–10.)

On December 9, 1997, Defendant wrote to Plaintiff stating that as of November 30, 1997, Plaintiff's employment was terminat-

ed. (McQuain Dep.Ex. 12.) On December 30, 1997, Plaintiff filed a charge of disability discrimination with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC). The EEOC issued Plaintiff a right to sue letter on April 21, 1998. Plaintiff filed suit in state court on May 15, which Defendant removed to federal court on June 16, 1998. Defendant filed its Motion for Summary Judgment on February 26, 1999. Plaintiff filed a Response on April 1, 1999. Defendant filed a Reply on April 16, 1999.

### Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court will view the summary judgment motion in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Summary judgment should be granted if the party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505). If the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 149 (6th Cir.1995). The text of FED. R.CIV.P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.

Although parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred that, " 'it is well settled that only admissible evidence may be con-

sidered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States,* 20 F.3d 222 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988)). FED.R.CIV.P. 56(e) also has certain, more specific, requirements:

> [Rule 56(e) ] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley,* 20 F.3d at 225–26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The court will

not consider nonmaterial facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. The judge's sole function is to determine whether there is a genuine factual issue for trial, which does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

### Discussion

### I. ADA and OHIO REV.CODE § 4112 Claims[3]

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

When, as in the present case, "an employer admits that it relied upon a disability in making an adverse employment decision, an employee may establish a *prima facie* case of employment discrimination under the ADA by showing that he or she (1) has a disability, and (2) is 'otherwise qualified' for the position despite the disability either '(a) without accommodation from the employer'; (b) with an alleged 'essential' job requirement

---

**3.** "The essential elements of a claim brought under the ADA and the Ohio handicap discrimination statute are the same. Therefore, the case law regarding claims brought under the ADA applies equally to claims brought under the Ohio statute." *Hoffman v. Fidelity Brokerage Servs., Inc.,* 959 F.Supp. 452, 457 n. 1 (S.D.Ohio 1997) (citation omitted); *see also*

*City of Columbus Civil Serv. Comm'n v. McGlone,* 82 Ohio St.3d 569, 697 N.E.2d 204, 206–07 (1998) ("The federal [ADA] is similar to the Ohio handicap discrimination law.... We can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.").

eliminated; or (c) with a proposed reasonable accommodation.' " *Hamlin v. Charter Township of Flint,* 165 F.3d 426, 429 (6th Cir.1999) (quoting *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996)).[4] "The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Monette,* 90 F.3d at 1186.

 A disabled employee who claims that he or she would be "otherwise qualified" to perform the essential functions of the job with a reasonable accommodation "bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette,* 90 F.3d at 1183. A "reasonable" accommodation is one which is generally "efficacious and ... proportional to costs." *Id.* at 1183 (citation omitted), 1183–84 n. 10. If the employer claims that a proposed accommodation will impose an undue hardship, the employer must prove that fact. "If the employer claims instead that the disabled individual would be unqualified to perform the essential functions of the job even with the proposed accom-

modation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation." *Id.* at 1184; *see also id.* at 1186 n. 12.[5]

Under the ADA, an employer need only reassign a disabled employee to a vacant position. *See* 42 U.S.C. § 12111(9)(B); *Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 634 (6th Cir.1998). "An employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available.... However, a reassignment will not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement." *Cassidy,* 138 F.3d at 634 (citation and footnote omitted).

The parties agree that Defendant considered Plaintiff's disability in deciding to terminate his employment. The disputed issue is whether or not Plaintiff is "otherwise qualified" to perform an available job. These cases fall into two broad categories: (1) cases in which the plaintiff claims that he or she can in fact perform the sought

---

4. Defendant admitted that it relied on Plaintiff's disability in determining that there were no positions available for a person with Plaintiff's restrictions. (Weigand Dep. at 100, 109–10.) Thus, "when the plaintiff has direct evidence of discrimination based on his or her disability, there is no need for a *McDonnell Douglas* type burden shift...." *Monette,* 90 F.3d at 1184. When a plaintiff does not have direct evidence, she can establish her case indirectly by first establishing a *prima facie* case that: (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and, (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. Thereafter, *McDonnell Douglas* burden shifting applies. The defendant must then offer a legitimate explanation for its action which, if the explanation satisfies the defendant's burden of production, the plaintiff must introduce evidence that the ex-

planation is pretextual. Under this scenario, plaintiff always retains the burden of persuasion. *See id.* at 1186–87.

5. The term "reasonable accommodation" is defined at 42 U.S.C. § 12111(9):

The term "reasonable accommodation" may include—
(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.
The term "undue hardship" is defined as "an action requiring significant difficulty or expense" when considered in light of the factors codified at 42 U.S.C. § 12111(10)(B).

after position; and, (2) cases in which the plaintiff claims that a certain function of the job is nonessential or that he or she can do the job with a reasonable accommodation. *Monette,* 90 F.3d at 1182; *see also Hile v. Pepsi–Cola General Bottlers, Inc.,* 108 F.3d 1377, 1997 WL 112404, at *4 (6th Cir.1997) (unpublished). The dispute in the matter at hand is primarily centered on the first of these two categories. Plaintiff has not requested a specific reasonable accommodation nor challenged a job function as nonessential; he mainly argues that he was qualified for other vacant positions with Defendant.

◼ From October 1997 through Plaintiff's termination in November 1997, when Plaintiff wanted to come back to work and when the alleged discrimination took place, Defendant asserts that it did not have any vacant positions for which Plaintiff was qualified. Plaintiff asked for reinstatement to his former temporary position of installation clerk. The Court is mindful of Plaintiff's desire and efforts to return to work and respects Plaintiff's past efforts to do so, although those efforts were unsuccessful because of Plaintiff's physical condition. An employer, however, is not required by law to create a new job or displace other employees in order to accommodate a disabled employee. *Cassidy,* 138 F.3d at 634. Plaintiff neither offered an objectively reasonable accommodation nor challenged a specific job criterion as essential to any of the positions that Defendant had available. Thus, the burden remains on Plaintiff to demonstrate that he was in fact qualified for a job, but was discriminated against because of his disability.

◼ Plaintiff admitted that he was not qualified for his original job of receiving clerk because of his lifting and carrying restrictions. (McQuain Dep. at 81.) The second position of quality control inspector no longer existed.[6] (Weigand Dep. at 111.) The third position of temporary installation clerk was no longer available either. (Weigand Dep. at 110–11.) According to Mr. Weigand's affidavit ("[A]n affidavit that I, I guess I participated in. . . . That was signed by me." (Weigand Dep. at 116.)), in October or November 1997 there were eight positions available at Ebner: receptionist, administrative assistant, two CAD designer positions, buyer, cost accountant, security guard, and technical service representative. Plaintiff was not considered qualified for any of these positions. The receptionist and administrative assistant positions required typing abilities of 40–50 words per minute. The two CAD designer positions required a two-year technical degree, or related experience, and experience with 3D CAD software. The technical service representative required fluency in Spanish. The cost accountant position required a four-year degree in an accounting related field or extensive experience. The buyer position required a two-year degree and related experience. The security guard position required physical requirements beyond Plaintiff's limitations.

◼ Plaintiff argues that Defendant must establish that reinstating Plaintiff to his prior position of installation clerk is an undue hardship. However, an employer must prove undue hardship only when the employer claims that the employee's proposed accommodation will impose an undue hardship. Defendant is not asserting that a proposed accommodation will impose an undue hardship. Rather, Defendant asserts that the temporary installa-

---

**6.** Plaintiff does not assert that there was a position available in the quality control department, a job for which he was arguably qualified. Even if he argued that he was qualified for the quality control job he held in 1994, his claim would fail. Employers are under no duty to keep employees on unpaid leave indefinitely until a position for which they are qualified opens up, nor are they required to accommodate the employee by leaving a position open or filling it temporarily. *Monette,* 90 F.3d at 1187. While employers may be required to transfer a disabled employee to an acceptable position, that position must be vacant. *Id.*

tion clerk position was eliminated. As noted above, an employer is neither required to create a job anew, nor move another employee. An employer may reinstate an employee to a vacant position for which he or she is qualified, but in the case at hand, Plaintiff was not qualified for any vacant position.

Plaintiff argues that he was qualified, with or without reasonable accommodation, for several vacant positions with Defendant.[7] Plaintiff asserts that he was qualified for the administrative assistant position in shipping and receiving given to a new hire. However, the evidence in the record shows that Defendant required applicants for this position to type 40 to 50 words per minute. There is no evidence in the record that Plaintiff could meet this requirement or that Plaintiff challenged this requirement as an essential function of the position. As for the other jobs that were available at or around the time Plaintiff was not reinstated and terminated, Plaintiff has neither demonstrated that he is qualified for those positions, nor has he challenged any particular requirement as essential functions of the positions at issue. *See Monette*, 90 F.3d at 1184 (holding that when an employer claims that the disabled individual is not qualified to perform the essential functions of a job, the burden of proof is on the disabled individual to show that he or she is qualified, with or without an accommodation).

Because Plaintiff has neither met his burden of proving that he is otherwise qualified for a position without an accommodation, nor specifically proposed a reasonable accommodation or challenged any particular job requirement as an essential

7. Plaintiff contends that "Ebner admits that McQuain was qualified for clerical and receptionist positions, but has not provided this court with any evidence that placing McQuain in these positions would have been an undue hardship." Nowhere in the record does Defendant admit that Plaintiff was qualified for these positions; instead, Defendant argues the opposite. As noted above, the burden is on Plaintiff to show he is qualified for a vacant position, or propose a specific accommoda-

function of the position in question, Plaintiff's ADA and OHIO REV.CODE § 4112 claims fail.

## II. FMLA Claim

The Family and Medical Leave Act entitles "an eligible employee ... to a total of 12 workweeks of leave during any 12–month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1), (a)(1)(D). An "eligible employee" is an employee who has been employed for at least 12 months by his or her employer *and* has been employed for at least 1,250 hours of service with such employer during the previous 12–month period. 28 U.S.C. § 2611(2)(A).

Defendant asserts, and Plaintiff does not refute, that Plaintiff did not work at least 1,250 hours in the 12–month period immediately preceding his leave of absence. In his Complaint, Plaintiff failed to allege the number of hours that he worked. Defendant argues that Plaintiff's claim is barred because he is not an eligible employee under FMLA. Plaintiff counters that he should be considered an eligible employee because Defendant failed to give Plaintiff notice of his ineligibility within two days of the leave period as required by 29 C.F.R. § 825.110(d) and, therefore, Defendant is estopped from challenging Plaintiff's eligibility.

Although Plaintiff is ineligible according to the plain language of the statute, he argues that the Secretary of Labor's regulation confers eligibility on him. 29 C.F.R. § 825.110(d) states:

tion, or challenge as expendable a particular function of a vacant position. Plaintiff has failed to meet his burden. The burden would shift to Defendant to show that a proposed accommodation is an undue hardship or that a job criterion is necessary only when and if Plaintiff proposed a specific reasonable accommodation or challenged a particular job requirement as unessential. *See Monette*, 90 F.3d at 1184.

(d) The determinations of whether an employee has worked for the employer for at least 1,250 hours in the past 12 months and has been employed by the employer for a total of at least 12 months must be made as of the date leave commences. If an employee notifies the employer of need for FMLA leave before the employee meets these eligibility criteria, the employer must either confirm the employee's eligibility based upon a projection that the employee will be eligible on the date leave would commence or must advise the employee when the eligibility requirement is met. If the employer confirms eligibility at the time the notice for leave is received, the employer may not subsequently challenge the employee's eligibility. In the latter case, if the employer does not advise the employee whether the employee is eligible as soon as practicable (*i.e.,* two business days absent extenuating circumstances) after the date employee eligibility is determined, the employee will have satisfied the notice requirements and the notice of leave is considered current and outstanding until the employer does advise. If the employer fails to advise the employee whether the employee is eligible prior to the date the requested leave is to commence, the employee will be deemed eligible. The employer may not, then, deny the leave. Where the employee does not give notice of the need for leave more than two business days prior to commencing leave, the employee will be deemed to be eligible if the employer fails to advise the employee that the employee is not eligible within two business days of receiving the employee's notice.

■ The Administrative Procedure Act (APA), 5 U.S.C. §§ 551–59, 701–06, 3105, 3344, 6362, 7562, governs most decision-making by federal agencies. Subject to specific exceptions, § 553 requires agencies to use notice and comment procedures in adopting legislative rules.[8] However, "an agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). When reviewing an agency action, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of agency action." 5 U.S.C. § 706.

Under 29 U.S.C. § 2654, the Secretary of Labor was given authorization to "prescribe such regulations as are necessary to carry out" FMLA. However, it is axiomatic that when "Congress has resolved a policy dispute in the process of enacting a statute, an agency or court can, and must, adopt Congress' resolution." KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.3 (3d ed. 1994 & Supp.1998).

■ When a court reviews regulations promulgated by an agency, the Supreme Court has laid-out a two-step approach that strikes a respectful balance between judicial oversight of legal issues and judicial deference to agency policy choices. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under step one "is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agen-

---

8. While an interim version of the regulation at issue was circulated for notice and comments, 58 Fed.Reg. 31,794, 31,816 (1993), there is no comment or legislative history available for the final version. The final regulations were adopted on January 6, 1995, 60 Fed.Reg. 2,180 (1995), and were scheduled to take effect in February 1995. The effective date was delayed, however, until April 6, 1995. 60 Fed.Reg. 6658 (1995). *See Wolke v. Dreadnought Marine, Inc.,* 954 F.Supp. 1133, 1135 n. 3 (E.D.Va.1997). The parties have not addressed the issue of whether the amendment of the regulation complied with § 553 of the APA; as such, this Court declines to address this issue.

cy, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. The Court noted that the "judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. 2778.[9] *See also, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Holly Farms Corp. v. NLRB,* 517 U.S. 392, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996).

■■■■ Under step two, if "the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 (footnotes omitted). Courts defer to an agency's interpretation at this point because, when "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. 2778 (footnote omitted). Even when Congress has left an implicit, rather than explicit, delegation to the agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by

the administrator of an agency." *Id.* at 844, 104 S.Ct. 2778 (footnote omitted).

■■■■ Under step one of the *Chevron* two-step, if Congress has spoken to the precise question at issue and the regulation is at odds with Congress's intent, then the regulation is void. Congress clearly spoke to the precise issue of employee eligibility under FMLA, stating that an employee was eligible under the Act if she worked for 12 months *and* 1,250 hours during the previous 12-month period. Congressional intent is clear and the plain language of the statute is unambiguous. Therefore, as other district courts have found, the regulation at issue, "29 C.F.R. § 825.110, is invalid, because it impermissibly contradicts the clear intent of Congress to restrict the class of employees eligible for the FMLA." *Wolke v. Dreadnought Marine, Inc.,* 954 F.Supp. 1133, 1135 (E.D.Va.1997); *see also Dormeyer v. Comerica Bank—Illinois,* No. 96 C 4805, 1998 WL 729591, at \*3–\*5 (N.D.Ill. Oct.14, 1998) (unpublished) (stating that an employee who had not worked at least 1,250 hours within 12-month period is ineligible under FMLA, and holding that 29 C.F.R. § 825.110(d) is invalid); *Fisher v. State Farm Mut. Auto. Ins. Co.,* 999 F.Supp. 866, 870 (E.D.Tex.1998) (agreeing with the *Wolke* court that "an employer who had previously approved FMLA leave could not be prohibited from asserting a later discovered legal impediment to the employee's claim."); *Seaman v. Downtown Partnership of Baltimore,* 991 F.Supp. 751, 754 (D.Md.1998) (holding that an employee who worked for less than 6 months was ineligible under FMLA and 29 C.F.R. § 825.110(d) is invalid as "a rewriting of the statute.").

9. The "traditional tools of statutory construction" include, *inter alia,* the plain language of the statute, the statute's origin and purpose, Congressional intent, whether the construction was contemporaneous with the passage of the statute, length of time in effect, reliance placed on the regulation, consistency of the agency's interpretation, the agency's expertise, and the degree of scrutiny Congress has

devoted to the regulation in subsequent re-enactments of the statute. *See National Muffler Dealers Ass'n, Inc., v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979); *see also* Stephen G. Breyer & Richard B. Stewart, Administrative Law and Regulatory Policy 298–99 (3d ed.1992) (noting a host of factors that courts use to review agency interpretations, and citing cases in support).

As the *Wolke* court explained, 29 C.F.R. § 825.110(d) "purports to transform employees who are ineligible under the FMLA statute into eligible employees. Under a literal application of the regulation, an employer could work for one day, then inform her employer that she is sick and is leaving. If the employer fails to tell the employee she is ineligible for FMLA leave, the regulation at issue ostensibly would 'deem her eligible,' even though she has worked for merely one day. Any regulatory exceptions which purport to shorten the ... eligibility period are impermissible creations of the Department of Labor." *Wolke*, 954 F.Supp. at 1137. This Court agrees.

As Congress spoke to the precise issue of employee eligibility under FMLA, the Secretary of Labor's regulation—conferring eligibility on those employees who are ineligible under the plain language of the statute—is contrary to Congressional intent and is invalid.[10] Failing to plead or prove that he worked the required 1,250 hours during the previous 12–month period, Plaintiff is not an eligible employee under FMLA and thus his claim fails.

### III. Ohio Rev.Code § 4123.90 Claim

■ Under the supplemental jurisdiction statute, 28 U.S.C. § 1367, district courts are permitted to dismiss pendent state law claims if all federal claims have been dismissed. The Sixth Circuit has stated that "generally, if the federal claims are dismissed before trial ... the state claims should be dismissed as well." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 803 (6th Cir.1996) (inner quotes and citations omitted); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As the Court has dismissed Plaintiff's federal law claims, as well as Plaintiff's Ohio Rev.Code § 4112 claim (which was entwined with Plaintiff's ADA claim), the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim of workers' compensation retaliation under Ohio Rev.Code § 4123.90.

■ This matter was removed from state court to federal court. Regarding removal cases, the United States Code provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447. Now that this Court has dismissed the federal claims and declines to exercise supplemental jurisdiction, this Court lacks subject matter jurisdiction over Plaintiff's remaining state law claim. Accordingly, Plaintiff's state law claim under Ohio Rev. Code § 4123.90 is remanded to the Court of Common Pleas, Medina County, for further proceedings. *See Good v. Ohio Edison Co.*, No. 3:96 CV 7040, 1996 WL 652599, at *6 (N.D.Ohio July 12, 1996) (unpublished) ("The state courts are better suited to deal with issues of state law, and remand of the remaining claims to state court will not unduly prejudice the parties."); *Jacobs v. District Director of Internal Revenue*, 217 F.Supp. 104, 106 (S.D.N.Y.1963) ("While dismissal of the complaint is the usual procedure where a court lacks jurisdiction over the subject matter, the better course in a removed action is to remand the suit to the state court from which it was removed.").

### Conclusion

For the foregoing reasons, the Court finds that Defendant is entitled to judgment according to law. Therefore, Defendant's Motion for Summary Judgment (Document # 17) is GRANTED. Plaintiff's federal law claims, and Ohio Rev. Code § 4112 claim, are DISMISSED. Plaintiff's state law claim under Ohio Rev. Code § 4123.90 is REMANDED to the

---

**10.** Although 29 C.F.R. § 825.110(d) clearly fails step one, the regulation also fails step two of the *Chevron* analysis because it is "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778.

Court of Common Pleas, Medina County, for further proceedings.

IT IS SO ORDERED.